There are several issues in this appeal, but the Interstate Commerce Commission Termination Act makes it the simplest to resolve. ICTA gave the Surface Transportation Board exclusive authority over transportation by rail carriers and preempts state rules that have the effect of managing or governing that transportation. So if you're right about that, would a negligence cause of action be preempted? It could be. Well, that's what I'm worried about. I'd like your view on it. Under these facts, I think it would be. If it's telling the railroad how to run its yard, how to maintain its yard, how to improve its equipment. So what the reason? Well, negligence is typically based on a standard of care from which the party being sued has departed. So it seems to me your argument necessarily means not only that strict liability claims would be preempted, but negligence claims also. I think there could be a situation, a set of facts, where negligence was not. Judge Strict liability has the feel, more of a feel of a regulation. It is. Well, I understand. But here's my concern. The act doesn't seem to provide a remedy to injured parties. The government agency might find somebody or sanction them. So what you're saying is that the state causes of action are preempted by a federal law which leaves plaintiffs with no remedy at all. And that's why I don't find this the simplest way to arrive at the case, because I'm having trouble finding a field preemption doctrine that says you have no state remedy and you also have no federal remedy. Well, the plaintiffs would have a straight remedy if, let's say, there were similar issues as Emerson, where let's say BNSF had dumped vermicompost. There aren't. This isn't that case. There are not. But I think this goes to why ICTA preemption. I mean, this Court has called ICTA preemption sweeping and comprehensive. And the reason is that uniformity is vital to railroad operations. Railroad can't have differing rules from state to state on how it runs the rail yard, how it improves its equipment. And that's why most cases, in terms of court claims or regulation that face ICTA, have fallen. I think every time it's been in front of this Court, it has. This theory wasn't advanced in Eddy, right? Not this theory of preemption. Not this theory of preemption. That's correct. The factors that you just mentioned, the circumstances you just mentioned, also fit within the common carrier argument. Are you going to pivot to that next? I'm sorry. I missed one. Are you going to pivot to that next? Well, I certainly can if you'd like me to. Sure, we can. Before we go there, you can continue your questions. But before you go there, I do have some preemption questions. Why don't we take those up first?  Okay. So we're here on two different, on the state causes of action the jury was instructed on strict liability. And you're contesting that regarding state law. So there's been, I think, some interest in certifying it to the Montana Supreme Court. However, we don't have to. We can decide it on state law if we feel like we have enough and we believe that we know what's going to happen. And then you have the preemption issue. And so you said that's the easiest issue. But you've already gotten a little pushback on whether it's the easiest issue. My question is more, let's say that, and I'm only saying this hypothetically because we have not conferenced on the case. We do that after we hear oral argument. Let's say we agree with you on your state law claims. And we agree with you that the court erred in saying that it was strict liability. And we don't certify it. Do we need to decide the issue? I don't think you do. I mean, the Supreme Court has said in this Rietzman case that preemption is kind of a threshold issue. But if BNSF, I mean, we're here challenging strict liability. I mean, the jury found the railroad not negligent. And so that, I think, would It would take care of this case. It would take care of this case. But I know that there's a whole lot of other cases out there that are waiting for this case, right? But since we're interpreting state law here, it's only going to be binding on this case, right? That's correct. So it's not going to affect all those other cases. Now, if we decided the preemption issue, if hypothetically, let's say the panel said that it is preempted, what effect does that have on other cases? For other federal cases, obviously, they'd be bound by that. But in this circuit, on strict liability. And then the other state cases would not be bound by that. They would likely find it persuasive, but would not be bound by that strict liability preemption ruling. So could the court do what I would call, I'm just saying this all hypothetically, I'm trying to think through, and I'll ask questions of the other side as well, what we call the belt and suspenders. Say, okay, hypothetically, will you win on the state claims? But then say, even that being said, it's also preempted. Could the court do that? And what would be the advantage of that for you, representing BNSF? I think you could do that. And the court has done something similar before. And I think the advantage is because, one, these doctrines are related. I mean, the ICTA flows from the common carrier obligation. This is a federal obligation that railroads have. The HMTA flows from that obligation. The purpose of HMTA and ICTA is uniformity of rail regulation. Realizing that railroads can't just switch how they do things from one state to the other. They're crossing states all the time. And so that common carrier obligation, the obligation that they have to carry whatever is presented to them, whether it's dirt or nuclear waste, that is motivated, or the ICTA and HMTA are motivated by that obligation. And so then, would a state... A state rule to the effect that... A state rule to the effect that... I don't think it would. I think that's correct. If you wouldn't need to... I have one more question. Go ahead. No, you go ahead, and then I'll go ahead after. Go ahead. Right. I... I think the court could resolve it on that issue. We obviously raised that in the brief, that that was a problem that the Montana Supreme Court talked about. You go to strict liability when negligence doesn't solve the issue. Yeah. Yeah. Yeah. Yeah. I... We'd be happy to have the case disposed that way. We do think that's a problem. I do think it was... That was pretty significant error, and I think it's sort of, you know, a little bit enmeshed with the common carrier issue. And that goes to the point of strict liability in the first place. We impose strict liability because it's a deterrence. It's to discourage ultra-hazardous activity. It makes no sense when, at the same time, we tell the railroad... Counsel, I couldn't agree with you more, but you didn't appeal the district court's ruling that Eddie really foreclosed this, and I was quite puzzled by that. Well, because the common carrier obligation... That's when the common carrier obligation comes in. I mean, excuse me, the common carrier exception. Eddie said that on the facts of that case, there was an abnormally dangerous activity, and then, as you know, strict liability kicks in, and away we go. But we don't know much about the facts of that case. And there are a couple of really important premises there that I don't know that are applicable here. One was that BNSF knew about that this was an abnormally dangerous activity, knew that the vermiculite had asbestos in it, or at what time. We don't know the temporal component there, so there isn't a limitation. That's not appealed here. That BNSF didn't know? You argue strenuously you didn't know, but the district court made a ruling that Eddie foreclosed the argument that strict liability didn't apply. I think we didn't appeal that because the district court found that this was... Montana Supreme Court found that this was ultra-hazardous activity, but it doesn't matter if the common carrier exception applies. I agree with you there, too, but I'm just kind of signposting that that wasn't your argument. You didn't... The district court read Eddie to foreclose that, and that's not on appeal, correct? Well, whether it's abnormally dangerous...  And so... But whether the common carrier exception applies. I mean, that's really the meat of the argument. I'm only responding. I don't want to derail you. Pardon the pun. Too much here, but to the extent you're arguing about why strict liability doesn't fit here and that it doesn't make a whole lot of sense to be talking about an abnormally dangerous activity during a period of time when Burlington Northern, as far as I can tell, didn't know this had asbestos or that asbestos was dangerous, is a fertile ground for inquiry. But it's not going to happen in this case because that wasn't appealed. Well, I think they're related. In the very first case to come to the comment to accept or to really come up with the common carrier exception in the first place, the Iktisil-Skabat-Ingrid 1914 Second Circuit decision, and they talk about strict liability generally, Ryland v. Fletcher, the English common law doctrine. It's like, okay, whatever utility that has in the normal course, it doesn't make any sense for railroads. Well, I don't know that I agree on that point. And, again, now we really are kind of going off on... I'm so tempted to make another pun, but I'm not going to, about a spur track. But that ship has sailed here because that... You're shaking your head no. I don't think that ship has sailed because that's what the Iktisil-Skabat, they said, okay, yeah, this may be ultra-hazardous activity, but that was the don of the common carrier exception. They said it makes no sense to apply that to this situation. Okay, so we're not communicating very well. I may be misunderstanding. But your time is ticking down. So the issue on appeal is whether or not what we're talking about here fits within the common carrier exception. And so I'm afraid it's a very interesting case, and we could talk about it a lot. But I don't want to telescope it in. What I'm not sure and distracted by is whether we have finished. Judge Callan had one more question, I think, about preemption. I did have one more question. So let's finish that because otherwise we're not going to get to common carrier. You have a very active panel. So my other question is, hypothetically, if we were to agree with you that it's preempted, we would really have to publish on that issue, would we not, for it to have any teeth for BNSF? Correct. Because if it were just in a mem dispo, then it really isn't precedential. It would apply to this case, but no others, correct. All right. Since you want to talk about preemption, maybe I should tell you the reasons I think that preemption is not such a close call here. Please. And I'm surprised that you led with it. The district court had a theory, and he cited the Guild case, right, and the Emerson case. Right. And one of them, it seems to me, Emerson is somewhat analogous, and that's a Fifth Circuit case where they talked about basically about maintenance. It could be construed that way, right, disposing of brush, disposing of rail ties, and that that didn't necessarily involve transportation. So they wanted to narrowly construe this exception, which I think the Montana Supreme Court would do. I think that's what the district court was aiming at and why it cited these cases, right, because we're talking about whether I think the district court's theory is that we're talking about whether BNSF failed to maintain its rail yard. Thank you. Thank you for the question. So I think Emerson's important, and I think, you know, Emerson's obviously not binding. We don't think it's wrong, though. Well, I appreciate that. My question was, I think it's a closer call, and hence I was curious that you're relying on that rather than the Montana law. The distinction is, and I think it's consistent with Montana law. I think it's consistent with this Court's precedent. The distinction is they weren't, in Emerson, they weren't taking railroad ties from the rail bed. They weren't cutting vegetation along the rail bed. It didn't affect the operations of the yard. Here that's completely different. Here the yard shuts down if any asbestos is spilled, especially if this is ultra-hazardous. They can't run a train through that yard. They cannot put any personnel in the yard until specialized personnel clean it up, and that's the problem. That's the dividing line in NICTA cases. Is it affecting the flow of train traffic, slowing trains? Is it requiring maintenance of the yard? Is it requiring equipment modification? None of that was at issue in Emerson. It was just where they dumped their trash. The Court said under the defendant's argument there, they could have dumped it in the middle of town and that would have been preempted. How is that different than the common carrier exception? It seems to me that kind of activity would be outside the common carrier exception. And so I'm having trouble figuring out why there's a necessity. It's to preempt state law. Because that's trash disposal. I understand. Trash disposal is not covered by the common carrier exception. Normal carriage and storage is. And so I'm still having difficulty figuring out why the common carrier exception, properly applied, would need to be preempted by federal law. Because none of that vermiculite in the yard, it was along tracks, came off trains while they were traveling. In your case, I understand that. Yeah. And I understand that's why you argue the common carrier exception should apply. What I'm having a harder time figuring out is why application of state law here, which recognizes the common carrier exception, conflicts, makes you run your yard in any different way than you would have in the absence of that law. Because they have to shut down the yard when it falls to the ground from the tracks. And I may be misunderstanding that. No, not if the common carrier exception applies. Oh, if the common carrier exception applies. What you're saying is if we lose under the common carrier exception, we're going to have a problem because we'll have to shut down the yard and do stuff. And that might conflict with federal law. And I'm saying if you prevail under the common carrier exception, there is no reason to consider federal law. Is there? That's a fair point. So how many of these cases are there out there where you're being sued? My understanding is the company that created all of this stuff that turns out to have asbestos can't pay any money. So you're the deep pocket, right? That's right. There is a $2.9 billion trust that the bankrupt Grace Manufacturing put that money in trust to settle all future and past claims. All right. But then you're next in line. You were next in line. So how many cases do you have to litigate? I think there are over 200 right now. In Montana? In Montana. I have a question to follow up on your statement in response to Judge Hurwitz. You just said that stuff, the asbestos came off, I think, while the train cars were traveling down the tracks. And I have a different understanding of the record. I think there was evidence introduced that the cars were sealed by W.R. Grace before they came in, right, before BNSF hauled them. I think there was evidence that some of the cars may have been leaky. Some of the cars may have – and that there were switching operations that caused some escapement, I think. And then there was a separate theory about, which is what the district court relied upon, about allowing the asbestos to remain on the ground. Well, I think – First of all, do I have that right? You have it right. I don't think there's – we don't separate those two. I mean all the asbestos that was lying on the ground came from those two points. You're right. But it goes to how much it would interfere with railroad operations to prevent it, right? I can imagine – and the district court was concerned about whether or not you were – that was an argument at trial. I read that part of the transcript, that BNSF wasn't required to use – allow its rail cars to leak. That was the word they used. Or to allow this stuff to fly off during switching operations. I don't know that much about switching operations, but that sounds a whole lot like it's encompassing transporting asbestos to me. And then, of course, there's a separate theory about maintenance. It just goes to this point about I think there's some problems perhaps with your preemption theory. I'm not so sold that it is as much as you are, that it's as solid. And hence my curiosity about your not starting with the common carrier exception. Well, I think – like I said, I think they are very – they're closely related because they all flow from that obligation. And I do think that – I do think they're both strong. I do think that the dividing line in ICTA cases is when you're – when the claim would affect operations, would slow train traffic, would require – Right, and that's why the maintenance issue I think is tough for you under those cases. The district court relied upon the Fifth Circuit case in particular. But could I ask you this because I want to ask both parties and make sure I haven't missed anything. And that is what evidence – I have a lot of questions, but I'm not going to get to all of them today. What evidence supported plaintiff's contention that the asbestos at the downtown rail yard accumulated as a result of something other than transportation activities? There is no evidence in that – on that point. I mean, ER 525 to 526, plaintiff's expert, Dr. Staggs, discussed his understanding of how that came all from the rail traffic. And you mentioned it. Either leaking cars or – and the switching, it's so violent. So when they loaded that, they loaded it up on top because they were hopper cars, so they had those top – some of the dust stayed on. When they switched them together, the impact knocked some of it off. Those are the only two ways. ER 619, 625, 627, Doug Hale, who worked at the rail yard, described that as well. Those are the only ways that were identified that vermiculite into the yard other than what blew in from Grace's expansion plant, which was right next door. Right. Okay. All right. If you have other questions, you can ask them. Thank you. I think I'll let it go for now. We'll see what happens. All right. Well, we used all your time and more, so you don't have five minutes left, but I'm going to give you two minutes for rebuttal. Thank you. All right. Thank you. Good morning. He's taller than me. Good morning, Your Honors. Well, everyone's taller than I am, so don't feel bad. Me too. May it please the Court. My name is Kevin Parker, and I represent the families from Tom – the families of Tom Wells and Joyce Walder, who are the plaintiffs in the court below. And let me just turn right to the common carrier exception since the Court is interested in that, and then I'll deal with preemption as well. The parameters of the common carrier exception to strict liability and its application to this case are questions of Montana law, and in this case we have a Montana Supreme Court case right on point. Of course, it's BNSF versus Eddy from 2020 involving the same rail yard, the same practices, the same town. No, different questions, different facts in Eddy. And that's – I'm interested in your response to the question that Judge Christin just asked. It seems to me the record in this case shows that the dangerous substance was deposited on the tracks wholly as a result of transportation activities. In Eddy, there's joint ventures, there's a – they're doing other stuff together, different set of facts. So I'm trying to figure out, given the explication of the doctrine in Eddy, which the Montana Supreme Court adopts and says it follows the restatement, why aren't all the – why isn't all the asbestos here deposited on the tracks as a result of the common carrier's carriage or storage activities? If it is, that seems to be different in Eddy where there's other stuff going on. Eddy certainly included those facts, but Eddy focused on those facts as well. And under Eddy, the court focused on what is transportation. And allowing asbestos to accumulate on your rail yard is not transportation because – Even if it's a consequence of transporting the asbestos in and out of the rail yard? It's not transportation because the common carrier exception defines transportation according to a public duty, which in Eddy was a statute. A statute which requires the railroad to transport goods from point A to point B. A statute which says nothing about how to take care of your railroad for decades and decades and decades while this material is building up. Let me ask you this question I posed before because it troubles me about this case. The district judge said, and presumably you're seeking to uphold that ruling, that there can be strict liability when there's negligence. Let's put aside for a second whether he was right or wrong in that reading of the law. What do we do with the jury's finding that there was no negligence in this case? I don't think it affects the outcome at all. There were two alternative theories. And of course – Well, but as a matter of fact, the jury has found that there wasn't a departure from the applicable standard of care. And if there wasn't a departure from the applicable – because there's clearly injury to your clients. It wasn't a case where it said, well, there was negligence but no injury. So if there's no departure from the applicable standard of care and there's no negligence, and the only way you can prove strict liability is that the railroad was somehow negligent, how do I get there? I disagree with the premise that the only way we can prove strict liability is that the railroad was negligent. Well, that's what the district court said. The district court said, I'm not going to throw out the strict liability theory because as I understand the law, strict liability doesn't apply when there's negligence. And that's a question that, you know, that's a question that the jury gets to resolve. And my – I'm still back to this point. The jury resolved that question in this case. So let's assume for a moment that these guys were not negligent because I have to assume that that's what the jury found. Of course. And you didn't appeal that, correct? You did not appeal – No, we did not. You did not appeal the negligence and you did not appeal the no punitive damages. We did not appeal either of those points. Okay. So your theory is that even in the absence of negligence – it's not what the district court said – there's strict liability here simply because they were transporting a hazardous substance. Yes, Your Honor. That's what the law of Montana is. And that's what strict liability is. Why don't we certify this to the Montana Supreme Court then? Well, we asked the court to do that. We think that would be a very good idea. How did this case end up in federal court? We filed it in federal court. You wanted a state court ruling. Why didn't you file it in state court? It was many, many years ago, Judge Berwitz. We filed it in state court in the middle of COVID when state courts weren't really operating. We felt like we could get to trial quicker. My concern about giving extra work to the state Supreme Court, having served on one once, is that once you opt not to use the state system and then you come to us and perhaps you're worried that it might come out differently, it's a little unfair to bring the state Supreme Court back into it. I would respectfully disagree with that premise for a couple reasons. First, there are over 200 cases pending in Montana state court, and they're depending on the resolution of this common carrier question. And so this court is certainly capable of deciding questions of Montana state law. I'm sure you do it all the time. But this court is not capable of rendering an opinion that is binding on all the Montana state courts. Well, you can do that in any of the other cases. If we think we can do it, we can do it. But those cases are on hold right now, waiting a ruling. And so a ruling from this. Waiting a ruling in this case? Waiting a rule on the common carrier exception. Yes, Your Honor. I think we all agree that no matter how we interpret Montana law, it does not bind the Montana Supreme Court. So even if we agree with you or agree with the other side, you're both able to go to the Montana Supreme Court and say, well, those three non-Montana judges just don't understand our ways. And that's why we're asking for certification, so it can be decided by the Montana Supreme Court now. Well, what if we decide the preemption and we publish on the preemption and we say that it's preempted? What effect does that have on all of those cases? Well, that decision wouldn't be binding on the Montana Supreme Courts, but it would be persuasive. Certainly the common carrier issue. Because they think that we might know something about federal law. Well, of course you do. As opposed to that we might not know anything about Montana law. We wouldn't be persuasive to the extent we talk about state law. Of course, it's not what you know about and what you don't know about. It's the binding nature of the opinion. So let's go back to Montana state law for a moment. As I understand it, Montana adopts the restatement second of torts. They've said so. Right. We all agree that BNSF is a common carrier. Yes. We all agree that under the restatement, particularly under Section 521, first comment, that means that it's exempted from liability that arises from the transportation or storage of hazardous materials. Yes. So why in this case doesn't your theory involve the transportation or storage of hazardous materials? Because the hazardous materials, the materials that cause the harm, were no longer in transport. So you think the theory only applies during the moments they're in transport? Yes. I think the common carrier theory, the policy behind it is if a railroad is required by federal law to transport anything from one point to another and then a derailment occurs and the substance causes harm, then there shouldn't be strict liability. But that's not the case here. So you think the theory is limited to incidents that occur during moments of transportation? Yes, Your Honor. That's what the Montana Supreme Court said. Assuming that is the theory, Judge Christin asked you before, part of the theory of liability in this case, as I understand it, is that when cars were coupling, something came out. Isn't that during transportation? But we're not suing for what happened when they coupled. We're suing for the presence over decades. This is from the 20s, asbestos-containing vermiculite building up on their property for years. Sorry, I appreciate the second theory. So this goes to the town of East Troy, which the Montana Supreme Court cited. And as you know, that's a case, and there's a couple of bookend cases involving transportation until derailment. So it's not just taking the substance down the tracks, right? And I don't know if you read the opinion differently, but it seems to me the Montana Supreme Court cited town of East Troy with approval, and that's a case where there's a derailment. And just for the benefit of our listeners, I'm sure you know the facts of the case, but there was hazardous substance, there was a derailment, the chemicals spilled, and then there was a delay of about nine days, I think, while the railroad did not take action. Nothing was moving down the track. They didn't take action, and that substance was allowed to migrate and contaminate local groundwater. The other bookend case is a derailment. Nothing's moving down the track anymore. More hazardous substances, unfortunately, that derailed. In that case, in the second case, town of East Palestine or In-Ray East Palestine, the railroad took steps in the aftermath of the derailment to clear the tracks that were, I think, sorry to say, patently unreasonable. They set a fire in a residential neighborhood, these chemicals, and caused significant additional damage. I don't think that case is a problem for the application here, but the first one sure is because there was a derailment, and I want to hear your response. First of all, I think the Montana Supreme Court cited town of East Troy with approval, and there the railroad was granted this common carrier exception, even though the harm resulted from this nine-day delay in cleaning up the spill. What's your best response to that case, please? My response is that's a derailment case. I know there was a delay of nine days, but the incident happened during the transportation. The incident here happened over decades and decades of asbestos buildup. In addition to the asbestos falling off the trains, there's evidence in the record, the EPA, when they cleaned this up, found that it was dumped in some places. It was manipulated while it was there. Well, part of the record, I've looked hard at that, sir, and part of the record that you're referring to now I think pertains to W.R. Grace's activities at the baseball field and whatnot. But if we look at what BNSF knew and what BNSF did, I think the district court at summary judgment was left with the impression that BNSF had maintained a large stockpile, and then he realized that wasn't shown at trial. So if we're just looking at what BNSF did and really looking at what resulted just from the transportation, I just want to hear your best response to this. BNSF owned a rail yard that it used for transportation. During the course of that transportation, the rail yard became toxic over the decades. And on this point, forgive me for interrupting, but my understanding is that for a long time people didn't know, I think, the hazards of asbestos. But what I understand from the record is that there was evidence that BNSF did know that what it was hauling, which was the concentrate, had asbestos as of 1977. Is that right? I think that's right, Your Honor. That was disputed at trial. I know, but I'm doing my best here. But I think there's evidence that there's a one-year overlap of 1977 with both plaintiffs' exposures. Is that right? I think that's right, Your Honor. Okay. Go ahead. So to get back to what they did, the asbestos was no longer in transport when it came off the train. It's not on its way anywhere. It's just sitting there. So now we have BNSF. The theory is that they're, I just want to, if I may. Sure, Your Honor. Your theory is that they're subjected to strict liability for not cleaning up the asbestos off the tracks, right? They are subjected to strict liability because they had an abnormally dangerous condition, i.e. asbestos. That's my question. I understand the State Supreme Court to have held that the transportation of these materials subjects one to strict liability because it's an ultra-hazardous activity. Is it an ultra-hazardous activity not to clean your rails? See, it seems to me that's a negligence theory on which you lost. So I'm trying to figure out why the strict liability theory applies to the failure to clean up the yard, as opposed to the transportation. Two answers, Your Honor. In Montana, there's strict liability for ultra-hazardous activities and for conditions. And so that's right out of the Montana cases we cited in our brief. And so the buildup of this asbestos on their yard was an ultra-hazardous, ultra-dangerous, abnormally dangerous condition subjecting it to strict liability. And if I can get back to the courts or to the judge's negligence question, when you have strict liability, you don't need negligence. So the absence of negligence. I understand. And that's why I have some difficulty with the district court's ruling in your favor, because the district courts seem to say, well, you can't have strict liability when there is negligence. And that conflates two different theories. I don't read the court. I'm not sure what you're talking about there. But I think the point is that the absence of negligence is not a defense to strict liability. We all understand that. Okay. My concern is that what you're really urging in this case is a negligence theory. What you're really saying is we'll have no trouble with your common carriage. Your common carriage was terrific. And if as a result of your common carriage something occurred, you should have cleaned it up. And that strikes me as a negligence theory, not a strict liability theory. It's not a negligence theory under Montana law, or it may be, but that's not how we're proceeding, because Montana law has a six-factor determination. It uses to determine if something is an abnormally dangerous condition. And Montana law, the Montana Supreme Court decided that it was. You say Eddie is exactly on point. I don't think I agree with you as being exactly on point. It may be your best case, and it may be a confusing case, but I don't agree with you that it's exactly on point. I think there's room to argue why Eddie is not on. If Eddie were exactly on point, we would all agree that, okay, that's Montana law on this. Eddie left open the question of what activities fall within the common carrier exception. And that is the issue. That's what we're talking about here, right? That left open. That's before this Court. Okay, but if it left it open, how is it exactly on point? Well, the activities might have been different. And recall that the courts below in Eddie didn't adopt the common carrier exception, so that really hadn't been litigated in that case like it had been in this case. It resolved that, but I think there's even more that Eddie leaves open. It's just that they're not on appeal here. Eddie begins with this premise is on the facts here, basically, that this was an ultra-hazardous activity, and then it goes on from there and adopts the restatement. And so that's why we're talking about this exception, right, the common carrier exception. But it does relate back to your earlier question about what the ultra-hazardous activity is because I think your response to him was that under Montana law, allowing dust to, the condition of having dust in the rail yard is an ultra-hazardous activity. The district court ruled in this case that Burlington Northern was foreclosed from contesting that this, what we're talking about here, is an ultra-hazardous activity. I don't know that Eddie did that. I'm just taking it as unappealed here. It's not appealed here. And Eddie did go through the facts of this case, considering the buildup of the dust, and it found, it affirmed the determination that this was an unreasonably dangerous condition. Okay, so on the facts of that case, I don't know what time period Eddie encompassed. And as we know here, we're talking about one sliver, one year when BNSF was on notice that it was engaging in an ultra-hazardous activity. The premise of that doctrine doesn't fit in a period of time before people realize they're engaging in an ultra-hazardous activity. Recall that knowledge is not part of the calculus. I know, but it is part of the determination that something is an ultra-hazardous activity in the first place. That's in the restatement third, actually. But we're not going to go into that today. Again, it's a very interesting case. But it's also profoundly important to the parties involved, and we're really mindful of that in trying to get to the best answer here. I think we've pushed back on whether or not there's a viable preemption argument, or if that's the best way to go. We have this other problem with the common carrier doctrine and trying to get your best answer to why this isn't about harm. Your client's harm doesn't really arise from the transportation of this material. And for me, at least, I'm only one of three, but that is pivotal to this argument here today. And your best argument, I think, is that there was evidence about the—I reviewed it with opposing counsel. There was evidence about this escapement as the cars were moving. And you're not going forward on that theory today. You're going on the theory that there was an ultra-hazardous condition. And basically, this is why it sounds a whole lot like negligence, that Burlington Northern failed to maintain its premises. What's your best argument that that's not a negligent theory? My best argument, number one, is it's been decided, right? The jury said there's no negligence. Is that what you mean? No, that's not what I'm talking about. I'm talking about the fact that the Montana state courts have decided it's an ultra-hazardous— Wait, I don't know that they did, sir. That's what I'm trying to push back on. No, I think they did. Okay, I don't. But we're not going to answer that today because they didn't appeal it. So you're asking me, is that what you really mean? Because I don't think we need to discuss whether Eddie really forecloses that if it's not on appeal. That's right. I think it's established. That's right. So what they're appealing is that they fit within the common carrier exception. Your best argument, I think, the one you're advancing today, is that they don't because they engaged in another activity, and Montana certainly left that open, right? If there's another activity that they weren't statutorily obliged to undertake. And I think what the district court ruled, and what you're arguing today, is they weren't obligated by statute to not maintain their rail yard. That's exactly right. My time has expired. Can I answer that question? She's going to let you. Okay. Go ahead. So under Montana law, the parameters, the duty arising under the common carrier exception, the parameters of that are defined by the federal statutes, which say nothing about how to maintain a rail yard. They don't require BNSF to do anything or not to do anything. And so under the Montana Supreme Court's test, we're looking at what the statute requires. There is no public duty one way or another for a common carrier to maintain or not maintain the rail yard. That's the test for common carrier in Montana, and they haven't met it here. Well, if you're right about that, doesn't it give some extra force to their preemption theory? Because if they face different state standards throughout the country about how to maintain their rail yards, then there really is a preemption issue, is there not? There isn't, Your Honor, because under the basic, and I haven't touched on preemption at all, but the basic rule addresses whether the law affects the way the railroad is managed or regulated. And this case is very similar to a case this Court decided, the American Association of Railroads case. The facts are different. But in that case, this Court said that dumping hazardous property on your rail yard is an example of a non-preempt, and laws prohibiting the hazardous dumping would not be preempted. And that's essentially what this case is like and the Emerson case as well. No, see, what you're saying in this case is that they're liable for not cleaning up the asbestos, for not maintaining their rail yard in a particular way. And it seems to me once you start talking about maintaining the rail yard, we do have to start worrying about conflicting state standards. Well, and you've got ICTA. I mean, there's a whole line of cases that whether a railroad's activity is inseparable from transportation. For example, in Emerson, the discretionary discarding of waste was separate from transporting. And that's, I think, a Tenth Circuit case. But in Pace, smoke emitting from the train was not. And then similarly in Rushing versus Kansas City, that court found noise from the railroad car vibrations was integral to train transportation. So isn't the accumulation of asbestos more like the emission of smoke or noise from rail car vibrations and less than like discarding in the foliage? Absolutely not, Your Honor, and here's why. Emissions involve the actual running of the train. The cases where preemption is found involves running the actual train or railroad infrastructure like bridges. But that's not this case. This case is cleaning up your property, something that every property owner should do. And BNSF is seeking to escape from that, claiming it's a railroad owner. And as I sit down, let me make one more factual point. I think we understand your argument. Let me see if my colleagues, we've taken you quite a bit over. Do you have any additional questions? May I beg your indulgence to just hear this last point that counsel is trying to make? Yes. Because I think he's going to the one question I have left. Okay, go ahead. Thank you, Your Honor. There is no evidence in this record of the effect that requiring them to clean this up would have on railroad operations. Counsel, my friend, suggested it would require them to shut down, but that's just not in this record. They have the burden of proving that interference, and it's not in this record. And that's the point I wanted to make. And did you have another question? I've overstayed my welcome. Okay, that will conclude argument on your side, and you have two minutes. We would ask the court to affirm the judgment. I understand that. I'd like to start on the last point, if I may. You have two minutes to do what you're going to do. Thank you, Your Honor. ER 795 to 800 talks about the procedures that BNSF would be required to undertake to clean up vermiculite, concentrate if it's a whole ultra-hazardous material. ER 628 is an employee of BNSF describing those procedures. I'd like to talk about the issue that you raised, Judge Kristen, on the cases, the bookend. Actesel-Skabat v. Ingrid, the very first common carrier exception case, that did not involve material on the train while it was being transported. It had been on the dock, I think, six days, and then bombs were being carried onto a ship. And the court there said, we're not going to hold a railroad liable for harm caused by material that it is required to carry. And that's consistent with the federal definition of transportation. That's 49 U.S.C. 101.02 sub 9. And it's that broad definition of transportation that covers yards, facilities, handling of freight, transfer, and delivery of freight. In Hanford, they were liable. They weren't subject. Is that because they volunteered? That's correct. That's because they volunteered. And it was not a duty. During the war effort. Correct. Okay. Yes. And then there are a couple other cases, too. There's Johnson v. CSX out of the Western District of Kentucky. We cite that in the briefs. That was after a spill. And the plaintiff's argument was that, oh, no, this is a separate event. It's just carrying it on the track. And the court said there, no, it wouldn't be in there but for the common carrier obligation. And that's consistent with how the Montana Supreme Court decided that in Eddy. This is a negligence case under the guise of strict liability. I think that's right. And that is not a fit. BNSF was not negligent. They did everything they were supposed to do and were required to carry this material without knowledge that it was harmful. We'd ask that you reverse the district court. Thank you. All right. Thank you both for your argument in this matter. It was helpful. And I think students will still be interested in the law. We'll ask them later. So this matter will stand submitted.
judges: CALLAHAN, CHRISTEN, HURWITZ